IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **JOSEPH BUSHRA,** | |
| *Plaintiff* | CIVIL ACTION |
| v. | |
| **MAIN LINE HEALTH, INC.** | No. 2:23-cv-01090-HB |
| *Defendant* | |

---

**DEFENDANT'S BRIEF IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

---

Caren Litvin, Esq.
(Pa. Atty I.D. No. 41796)
150 N. Radnor Chester Road, Suite F-200
Radnor, PA  19087
CL@litvinlawoffice.com
(610) 977-2049 (office)
*Counsel for Defendant, Main Line Hospitals, Inc.*

Brendan Hennessy
(Pa. Attorney I.D. No. 91831)
101 Lindenwood Drive, Suite 225
Malvern, PA 19355
bhennessy@hennessylawfirm.com
(484) 875-3111 (office)
*Of Counsel to Litvin Law Office
for Defendant, Main Line Hospitals, Inc.*

Dated:  October 16, 2023

## TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................... ii

TABLE OF AUTHORITIES ............................................................................................. iii

I.  INTRODUCTION ................................................................................................. 1

II.  SUMMARY JUDGMENT STANDARD........................................................... 3

III. LEGAL ARGUMENT.......................................................................................... 4

  A.  Plaintiff cannot maintain a Title VII action against Main Line Health, Inc., which was
  never his employer. ................................................................................................. 4

    1.  Dr. Bushra was an employee of MLEMA, not MLH, with respect to his work as an
    emergency room doctor and campus chief at Lankenau. .................................... 4

    2.  Dr. Bushra had an independent contractor relationship with Main Line Hospitals,
    Inc. in connection with his role as EMS Medical Director ................................ 6

  B.  Plaintiff's claims under the PHRA must be dismissed based on  his failure to exhaust
  his administrative remedies..................................................................................... 8

  C.  Even if Plaintiff's claims are permitted to proceed under state or federal law, Plaintiff
  cannot establish a religious failure-to-accommodate claim .................................. 10

    1.  Plaintiff's objections to receiving the COVID-19 vaccine are not "religious" beliefs
    requiring accommodation. ................................................................................ 11

    2.  Granting Plaintiff a religious exemption would have imposed an undue burden on
    MLH's efforts to protect patients and employees ........................................... 15

  D.  Plaintiff cannot establish a claim for retaliation. ........................................... 21

    3.  Dr. Bushra has failed to establish a causal connection ............................... 23

IV.  CONCLUSION................................................................................................. 25

<u>**TABLE OF AUTHORITIES**</u>

**Cases**

*Africa v. Pennsylvania*, 662 F.2d 1025 (3d Cir. 1981) ............................................... 11

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................... 3

*Aukamp-Corcoran v. Lancaster Gen. Hosp.*, No. CV 19-5734, 2022 WL 507479 (E.D. Pa. Feb. 18, 2022) ........................................................................................................ 10

*Brown v. Children's Hosp. of Philadelphia*, 794 F. App'x 226 (3d Cir. 2020) ..................... 11, 14

*Brown v. J. Kaz, Inc.*, 581 F.3d 175 (3d Cir. 2009) ....................................................... 7

*Burgh v. Borough Council of Borough of Montrose*, 251 F.3d 465 (3d Cir. 2001) ................ 9

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) ................................... 22

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................. 3

*Dennison v. Bon Secours Charity Health Sys. Med. Grp., P.C.*, 2023 WL 3467143(S.D.N.Y. May 15, 2023) ........................................................................................................... 20

*Divine Equal. Righteous v. Overbrook Sch. for the Blind*, No. CV 23-846, 2023 WL 4763994 (E.D. Pa. July 26, 2023) .................................................................................... 21

*E.E.O.C. v. Geo Group, Inc.*, 616 F.3d 265 (3d Cir. 2010) ........................................ 17

*EEOC v. N. Mem'l Health Care*, 908 F.3d 1098 (8th Cir. 2018) ................................... 22

*Eldridge v. Municipality of Norristown*, 828 F. Supp.2d 746 (E.D. Pa. 2011), *aff'd*, 514 F. App'x 187 (3d Cir. 2013) ........................................................................................ 9

*Fallon v. Mercy Catholic Med. Ctr. Of Southeastern PA*, 877 F.3d 487 (3d Cir. 2017) ...... passim

*Faush v. Tuesday Morning, Inc.*, 808 F.3d 208 (3d Cir. 2015) ...................................... 6

*Federoff v. Geisinger Clinic*, 571 F. Supp. 3d 376 (M.D. Pa. 2021) ......................... 11, 19

*Finkbeiner v. Geisinger Clinic*, 623 F. Supp. 3d 458 (M.D. Pa. 2022), *appeal dismissed*, No. 22-2714, 2023 WL 6057495 (3d Cir. Sept. 18, 2023) .................................................. 12, 15

*Geerlings v. Tredyffrin/Easttown School District*, Civ. A. No. 21-4024, 2021 WL 4399672 (E.D. Pa. Sep. 27, 2021) ................................................................................................. 14

*Goodman v. Mead Johnson & Co.*, 534 F.2d 566 (3d Cir. 1976) ................................... 4

*Groff v. DeJoy*, 600 U.S. 447 (2023) ................................................................... 16, 17

*Holtzman v. The World Book Co.*, 174 F. Supp.2d 251 (E.D. Pa. 2001). ........................ 6

*Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265 (3d Cir. 2005) .................................. 3

*Kahn v. Am. Heritage Life Ins. Co.*, 324 F. Supp. 2d 652 (E.D. Pa. 2004) ..................... 6

*Kiel v. Mayo Clinic Health Sys. Se. Minnesota*, 2023 WL 5000255 (D.Minn.Aug. 4, 2023) ..... 13

*Lukus v. Westinghouse Elec. Corp.*, 276 Pa. Super. 232, 419 A.2d 431 (1980) .................. 8

*Moore v. City of Philadelphia*, 461 F.3d 331 (3d Cir. 2006) .................................... 21, 22

*Nationwide Mutual Ins. Co. v. Darden*, 503 U.S. 318 (1992) ....................................... 6

*Prewitt v. Walgreens Co.*, 2012 WL 4364660 (E.D. Pa. Sept. 25, 2012) ........................ 12

*Simon v. IPS-Integrated Project Servs.*, LLC, No. CV 17-03474, 2018 WL 3585137 (E.D. Pa. July 26, 2018) ...................................................................................................... 10

*Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63 (1977) ..................................... 6, 16

*Uber v. Slippery Rock University of Pennsylvania*, 887 A.2d 362 (Pa.Commw. 2005) ............ 7

*Ulrich v. Lancaster Gen. Health*, No. CV 22-4945, 2023 WL 2939585 (E.D. Pa. Apr. 13, 2023) ......................................................................................................................... 11

*United States v. Seeger*, 380 U.S. 163 (1965) ............................................................ 11

*Velocity Express v. Pennsylvania Human Relations Commission*, 853 A.2d 1182 (Pa.Cmwlth.2004) ............................................................................................... 7

*Webb v. City of Philadelphia*, 562 F.3d 256 (3d Cir. 2009) ......................................................... 10

*Wisconsin v. Yoder*, 406 U.S. 205  (1972) .................................................................................... 15

*Woodson v. Scott Paper Co*., 109 F.3d 913 (3d Cir. 1997) ............................................................ 8

**Statutes**

Pennsylvania Human Relations Act ("PHRA"), 43 P.S. §§951 et seq. ................................. passim

Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. §2000e-2(a) *et seq*. ..................... passim

**Rules**

Rule 12(b)(6) of the Federal Rules of Civil Procedure ................................................................. 14

Rule 56 of the Federal Rules of Civil Procedure .......................................................................... 3

## I.   __INTRODUCTION__[1]

In March 2020, COVID-19 plunged the world into a global pandemic that has claimed the lives of over a million Americans. (SMF ¶44) Main Line Health (MLH) and other health care institutions were on the front lines of fighting the pandemic as sick patients flooded into hospitals. When the Delta variant was raging in 2021, MLH implemented a policy requiring employees and medical staff to be vaccinated against COVID-19. (SMF ¶¶82-83). The COVID Vaccination Policy allowed exemptions for medical conditions or sincerely held religious beliefs that precluded vaccination. (SMF ¶86).

Plaintiff, Joseph Bushra, is an emergency room doctor. (SMF ¶4, 9). Dr. Bushra is an owner and employee of Main Line Emergency Medical Associates LLC ("MLEMA"), which has the exclusive contract to provide emergency doctors to the four hospitals in the MLH system, including Lankenau Medical Center. (SMF ¶¶2-5). Dr. Bushra began working as an emergency room at Lankenau in 2003 as an employee of MLEMA. (SMF ¶4). He became an owner of MLEMA in 2006 and has remained an employee and owner of MLEMA since that time. (SMF ¶5, 163). He admits that he has never been employed by Main Line Health, Inc. (SMF ¶7).

In addition to his work performed as an owner/employee of MLEMA in Lankenau's emergency department, Dr. Bushra had an independent contractor agreement with Main Line Hospitals, Inc. to provide guidance to the health system on EMS issues on a part-time basis. (SMF ¶¶26, 29). Dr. Bushra admits that he was never an employee of Main Line Hospitals, Inc. (SMF ¶27). All physicians with admitting privileges to Main Line Health hospitals, including emergency

---

[1] Defendant's Statement of Undisputed Material Facts, which is filed contemporaneously with this Memorandum of Law in accordance with Fed.R.Civ.P. 56, is referenced herein as "SMF" followed by the specific paragraph which contains the full factual statement and record evidence in support of such assertion.

room doctors employed by MLEMA, must be members of the MLH medical staff. (SMF ¶¶21-22). The medical staff was required to comply with the COVID Policy.  (SMF ¶83).

Dr. Bushra requested a religious exemption to the COVID-19 vaccine, raising four objections: (1) receiving a vaccine that had been developed using fetal cell lines would violate his stance against abortion; (2) he recovered from COVID-19 infection and believed the risks of vaccination outweighed the benefits for him; (3) COVID-19 vaccines were in short supply and it would violate his religious beliefs to receive a scarce vaccine before someone else who may receive a greater benefit; and (4) "most importantly" receiving the vaccination would violate his conscience.  (SMF ¶¶104-105, 119, 124-125). His exemption request included a letter from his minister stating that Dr. Bushra would be violating his conscience by obtaining the COVID vaccine.  (SMF ¶128).

The MLH Religious Exemption Committee reviewed Dr. Bushra's exemption request and determined that it failed to reflect sincerely held religious beliefs that precluded COVID vaccination. (SMF ¶145).  Dr. Bushra appealed the denial and his exemption request was reviewed by the Appeals Committee, the Credentials Committee and ultimately a subcommittee of the Medical Executive Committee, all of which concluded that he failed to state a sincerely held religious belief that prohibited vaccination. (SMF ¶¶145, 151-153).

Dr. Bushra, like all members of the medical staff who failed to obtain the COVID-19 vaccine or an approved exemption, was placed on administrative suspension on November 15, 2021.  (SMF ¶¶162). Dr. Bushra filed a federal court action against Main Line Health, Inc., alleging that Defendant subjected him to religious discrimination and retaliation in violation of Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. §2000e-2(a) *et seq*. and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. §§951 et seq.  (ECF Doc. No. 1).

2

Now that discovery is complete, Defendant moves for summary judgment because:

1.  Dr. Bushra was never employed by Defendant Main Line Health Inc. and therefore cannot maintain a Title VII action against Defendant.  In particular:

    a.  Dr. Bushra was an employee-owner of MLEMA in connection with his work in the emergency department at Lankenau, an entity he did not sue;

    b.  Dr. Bushra had an independent contractor agreement with Main Line Hospitals, Inc. to serve as the Medical Director for Emergency Medical Services, and Title VII does not protect independent contractors.

2.  To the extent that Dr. Bushra has any claims under the PHRA, those claims must be dismissed for failure to exhaust his administrative remedies.

3.  Even if the Court determines that Dr. Bushra can pursue a religious discrimination or retaliation claim under Title VII or the PHRA, those claims must be dismissed because he has failed to established the requisite elements of such claims.

## II.    SUMMARY JUDGMENT STANDARD

Summary Judgment under Rule 56 of the Federal Rules of Civil Procedure is "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*.  In evaluating a summary judgment motion, a court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor. *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005). Nevertheless, the party opposing summary judgment must support each essential element of the opposition with concrete evidence in the record. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). This

requirement upholds the purpose of summary judgment "to eliminate a trial in cases where it is unnecessary and would only cause delay and expense." *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976).

## III.   LEGAL ARGUMENT

### A.   Plaintiff cannot maintain a Title VII action against Main Line Health, Inc., which was never his employer.

In order to maintain a Title VII claim, a plaintiff must establish an employment relationship with the defendant. *Covington v. Int'l Ass'n of Approved Basketball Offs.*, 710 F.3d 114, 199 (3d Cir. 2013). As detailed below, Dr. Bushra was employed by MLEMA in his capacity as emergency room doctor and campus chief at Lankenau. In addition, Dr. Bushra had an independent contractor agreement with Main Line Hospitals, Inc. Dr. Bushra admits that he was never an employee of Defendant Main Line Health, Inc. or Main Line Hospitals, Inc. (which is not a Defendant). Therefore, he cannot pursue a Title VII action against Defendant.

#### 1.   Dr. Bushra was an employee of MLEMA, not MLH, with respect to his work as an emergency room doctor and campus chief at Lankenau.

Dr. Bushra readily admits that he was never employed by Main Line Health, Inc. (SMF ¶7). Rather, throughout the time that he worked at Lankenau, as both emergency room doctor and campus chief, Dr. Bushra was employed by MLEMA. (SMF ¶¶4-8). MLEMA has the exclusive contract to staff Lankenau's emergency department. (SMF ¶2). MLEMA determines the staffing levels for Lankenau's emergency department, furnishes the doctors, physician assistants and nurse practitioners who staff the emergency department, handles billing for services rendered to patients in the emergency room and compensates its employees, including emergency room physicians like Dr. Bushra. (SMF ¶¶2-3, 14).

Dr. Bushra has an employment contract with MLEMA. (SMF ¶¶13-14). MLEMA's Employee Handbook governs his employment. (SMF ¶¶15-16). Dr. Bushra is also an owner of

MLEMA and is party to MLEMA's Operating Agreement. (SMF ¶¶5, 18). Dr. Bushra was not compensated by Main Line Health for the work performed in Lankenau's Emergency Department; rather, he received distributions from MLEMA based on that entity's profits.  (SMF ¶¶18-20). MLEMA issued K-1 statements to Dr. Bushra which reflect his ownership interest and annual distributions.   (SMF ¶¶19-20). Dr. Bushra is a participant in MLEMA's deferred compensation plans, including a 401(k) profit sharing plan and  defined benefit plan. (SMF ¶17).  Dr. Bushra was eligible for health insurance benefits, disability benefits and life insurance benefits through MLEMA.  (SMF ¶14-15). MLEMA paid for his malpractice insurance.  (SMF ¶¶14-15).

In addition to providing care to patients, Dr. Bushra was campus chief of Lankenau's emergency department.  (SMF ¶10). As campus chief, he was responsible for predicting patient volume and ensuring that staffing levels were appropriate and that the schedule was filled appropriately, handling complaints from staff and patients and representing the emergency department at hospital meetings.   (SMF ¶11). Dr. Bushra did not receive any additional compensation for serving as campus chief.  (SMF ¶12). Rather, those duties were part of his MLEMA role for which he received his annual distribution from MLEMA.  (SMF ¶12).

Dr. Bushra readily admits that he was an employee of MLEMA, not Main Line Health, in connection with his duties as an emergency room doctor and campus chief at Lankenau. (SMF ¶4, 7). In fact, his EEOC Complaint clearly states as follows:  "I am a physician employed by Main Line Emergency Medical Associates LLC ("MLEMA") contracted to provide Emergency Medicine Services in the Emergency Department (ED) of LMC." (SMF ¶8). He did not, however, initiate an administrative action against or sue MLEMA, his employer; instead he sued Main Line Health, Inc, which he acknowledges was not his employer.  As there is no factual dispute that Dr. Bushra was never an employee of Defendant, his Title VII claims must be dismissed.

> ### 2. Dr. Bushra had an independent contractor relationship with Main Line Hospitals, Inc. in connection with his role as EMS Medical Director

Apart from Dr. Bushra's employment by MLEMA to provide services in Lankenau's emergency room, Dr. Bushra had a contract with Main Line Hospitals, Inc. to provide guidance to the Main Line Health system on EMS issues for up to 48 hours a month. (SMF ¶¶26, 28-29). Dr. Bushra readily admitted that he was never employed by Main Line Hospitals, Inc. but rather, had an independent contractor relationship. (SMF ¶27). As an independent contractor, Dr. Bushra cannot pursue his Title VII claim against Main Line Health.

Title VII protections do not extend to independent contractors. *Holtzman v. The World Book Co.*, 174 F. Supp.2d 251, 253 (E.D. Pa. 2001). *See also Kahn v. Am. Heritage Life Ins. Co.*, 324 F. Supp. 2d 652, 655 (E.D. Pa. 2004) (finding a lack of subject matter jurisdiction over plaintiff's Title VII claim because "Title VII protects workers who are 'employees' but does not protect independent contractors.") In evaluating whether an individual is an employee or an independent contractor for purposes of Title VII, courts consider the following factors identified by the Supreme Court in *Nationwide Mutual Ins. Co. v. Darden*, 503 U.S. 318, 323-24 (1992):

> [T]he skills required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Faush v. Tuesday Morning, Inc.,* 808 F.3d 208, 213 (3d Cir. 2015). Analysis of the *Darden* factors in connection with Plaintiff's duties as EMS Director confirms that he was an independent contractor, not an employee, of Main Line Hospitals, Inc.:

1. Dr. Bushra exercised his professional judgment in performing his duties (SMF ¶34);

2. Dr. Bushra obtained EMS subspeciality certification and attended EMS conferences at his own expense for which he was not reimbursed (SMF ¶33);

3. Dr. Bushra received a 1099 from Main Line Hospitals for his services (SMF ¶31);

4. During the time that he served as EMS Medical Director, Dr. Bushra was an employee of MLEMA, not Main Line Health (SMF ¶37);

5. He was not eligible for any employee benefits as EMS Medical Director (SMF ¶36);

6. During the time that he was EMS Medical Director for Main Line Hospitals, Dr. Bushra was the Medical Director for other entities, including Narberth Ambulance, Villanova EMS, and American Medical Response. (SMF ¶40).

The determination that Dr. Bushra was an independent contractor rather than an employee of Main Line Hospitals, Inc. is reinforced by the agreement itself which explicitly states that Dr. Bushra was an independent contractor.   (SMF ¶36). As the Third Circuit has held, an independent contractor agreement, "while not dispositive of the plaintiff's employment status," is "strong evidence" that plaintiff was an independent contractor. *Brown v. J. Kaz, Inc*., 581 F.3d 175, 181 (3d Cir. 2009).  As there is no factual dispute that Dr. Bushra was not an employee of Main Line Health in connection with his duties as EMS Medical Director, he cannot pursue a Title VII action.

Claims brought under the PHRA are generally " 'interpreted coextensively with Title VII claims.' " *Brown v. J. Kaz, Inc*., 581 F.3d 175, 179 n. 1 (3d Cir.2009). Unlike Title VII claims, however, some independent contractors are protected from discrimination under the PHRA. *See Uber v. Slippery Rock University of Pennsylvania*, 887 A.2d 362, 364, n. 3 (Pa.Commw. 2005)(citing 43 P.S. § 955(a)). Medical doctors are included in the definition of independent contractors under the PHRA. *See Velocity Express v. Pennsylvania Human Relations Commission*, 853 A.2d 1182, 1186 n. 7 (Pa.Cmwlth.2004).  Thus, to the extent that Dr. Bushra has any remedies

for religious discrimination or retaliation in connection with his role as EMS Medical Director, those claims are limited to the PHRA.  However, as detailed below, Dr. Bushra is foreclosed from pursuing a PHRA claim because he did not exhaust his administrative remedies and he does not plead an entitlement to relief as an independent contractor in this Court.

### B.    Plaintiff's claims under the PHRA must be dismissed based on his failure to exhaust his administrative remedies.

On April 15, 2022, Dr. Bushra filed an EEOC charge. (SMF ¶8). Along with the EEOC Charge, Dr. Bushra's counsel included a form requesting that the charge be dual filed with the PHRC.[2] (SMF ¶176). Through a work-sharing agreement, the PHRC and the EEOC enter into an arrangement through which they apportion initial jurisdiction over discrimination complaints in order to avoid unnecessary duplication of investigatory time and effort. *Woodson v. Scott Paper Co.*, 109 F.3d 913, 925 (3d Cir. 1997). As such, a claim that is filed first with the EEOC can be processed by the EEOC, without being investigated as an initial matter by the PHRC. *Id.* Therefore, Pennsylvania waives its statutory right to initially process discrimination claims, and, hence, the agreement operates to "terminate" the PHRC proceedings with respect to those complaints that are filed first with the EEOC.[3] *Id.*

---

[2] This form is known by the EEOC as a "Lukus form." In *Lukus v. Westinghouse Elec. Corp., 276 Pa. Super. 232, 272, 419 A.2d 431, 452 (1980)*, the Pennsylvania Superior court determined that "transmittal of Lukus's EEOC complaint to the PHRC constituted a filing of a verified complaint with the PHRC."  The Lukus form asks the Charging Party to sign whether he or she wants the charge "dual filed" which can act as a substitute for the statutory requirement of filing a verified complaint with the PHRC.  In this case, Plaintiff's counsel, rather than Plaintiff, electronically "signed" it.  According to the PHRC, the Charge was never transmitted by the EEOC to the PHRC and thus it was never dual filed.  It is unclear if that occurred because Complainant did not actually sign the Lucas form or is attributable to some other deficiency. Defendant is not separately moving for judgment on this issue (other than to the extent it supports that Plaintiff cannot show, in response to this Motion, that he exhausted a PHRC remedy) but preserves any other rights in this regard.

[3] Plaintiff's allegation that he dual filed with the PHRC to trigger this work sharing agreement is not established by filing an EEOC Charge and merely pleading that it has been dual filed.  *See Woodson*, 109 F.3d 913, 926–27 ("Whether a plaintiff has initiated PHRC proceedings under the PHRA is a state law issue.... EEOC procedures are not a sufficient surrogate for PHRC remedies.").

When filing claims under the PHRA, a plaintiff must give the PHRC one year to investigate the administrative complaint before filing a complaint with this Court. 43 P.S. § 962(c). The PHRC "has exclusive jurisdiction over the claim for a period of one year in order to investigate and, if possible, conciliate the matter." *Burgh v. Borough Council of Borough of Montrose*, 251 F.3d 465, 471 (3d Cir. 2001). "[I]f within one (1) year after the filing of a complaint with the Commission, the Commission dismisses the complaint ... the Commission must so notify the complainant." 43 P.S. § 962(c). The complainant may then bring an action in court upon notice of the dismissal.

The EEOC dismissed Dr. Bushra's charge on December 19, 2022, which required Plaintiff to file suit within ninety days or else forfeit the right to pursue his federal court claims.  (SMF ¶177). Dr. Bushra filed his federal court Complaint on March 20, 2023 (91 days after the right to sue was issued), asserting claims under both Title VII and the PHRA.  While Defendants are not raising the timeliness of the filing under Title VII, Plaintiff filed before the expiration of the state agency's one-year of exclusive jurisdiction.  In light of the PHRA one-year limitation, Plaintiff's Complaint was filed prematurely with respect to his PHRA claims.

In such circumstances, a claimant cannot join the federal and state law claims in the same action, even when those claims are premised on the same conduct. Accordingly, "[c]ourts in the Third Circuit have adopted a more flexible approach to PHRA exhaustion by permitting plaintiffs to maintain PHRA claims if the period of exhaustion expires during the pendency of litigation or if plaintiff files an amended complaint after the period of exhaustion." *Eldridge v. Municipality of Norristown*, 828 F. Supp.2d 746, 758 (E.D. Pa. 2011), *aff'd*, 514 F. App'x 187 (3d Cir. 2013).  As this Court has observed, "a prematurely filed complaint can be cured of failing to exhaust its administrative remedies, if said complaint is amended after the one year limitation period." *Simon v. IPS-Integrated Project Servs*., LLC, No. CV 17-03474, 2018 WL 3585137, at *4 (E.D. Pa. July

26, 2018)(citations omitted).  Plaintiff did not, however, amend his Complaint to cure the failure to exhaust administrative remedies under the PHRA.  Moreover, Dr. Bushra's Complaint does not contend that he is entitled to relief under the PHRA as an independent contractor; rather—in contrast to his EEOC charge—he claims to be entitled to relief as an employee, which he was not.

Defendant's Answer to Plaintiff's Complaint and Affirmative Defenses, explicitly stated "Plaintiff failed to exhaust his administrative remedies under the Pennsylvania Human Relations Act."  (ECF Doc. No. 11, p. 18).  Despite such notification, Plaintiff did not cure the "premature filing" of his PHRA claim by filing an Amended Complaint after the one-year limitation had expired, and, as such, Plaintiff failed to exhaust is administrative remedies under the PHRA.

### C.  Even if Plaintiff's claims are permitted to proceed under state or federal law, Plaintiff cannot establish a religious failure-to-accommodate claim

Plaintiff contends that Defendant engaged in religious discrimination by denying his request for an exemption from the COVID vaccine mandate.  Even if the Court determines that Plaintiff can pursue remedies under Title VII or the PHRA, he cannot establish a claim for failure to accommodate his religious exemption request.

To establish a prima facie religious failure-to-accommodate claim, Dr. Bushra must establish that (1) he holds a religious belief that conflicts with a job requirement, (2) he informed MLH of the conflict, and (3) he was disciplined for failing to comply with the conflicting requirement. *Fallon v. Mercy Catholic Med. Ctr. of Southeastern PA*, 877 F.3d 487, 490 (3d Cir. 2017).  If Plaintiff makes such a showing, the burden shifts to MLH, which can obtain judgment in its favor by demonstrating either (1) "it made a good-faith effort to reasonably accommodate the religious belief," or (2) "such an accommodation would work an undue hardship on the employer and its business."  *Webb v. City of Philadelphia*, 562 F.3d 256, 259 (3d Cir. 2009). Plaintiff cannot establish a failure to accommodate claim because he cannot demonstrate that his

objections to the vaccine were religious and, even if he could, MLH would have suffered an undue hardship by allowing unvaccinated physicians with direct patient contact such as Plaintiff to work in the midst of a pandemic.

**1.    Plaintiff's objections to receiving the COVID-19 vaccine are not "religious" beliefs requiring accommodation.**

To establish a failure to accommodate claim, it is not sufficient merely to hold a "sincere opposition to vaccination;" rather, the individual must show that the "opposition to vaccination is a religious belief." *Brown v. Children's Hosp. of Philadelphia*, 794 F. App'x 226, 227 (3d Cir. 2020), *citing, Fallon, supra*, 877 F.3d at 490.  The Third Circuit has identified three factors in determining whether a belief is religious in nature:  whether the belief (1) addresses fundamental and ultimate questions having to do with deep and imponderable matters; (2) is comprehensive in nature, and (3) is accompanied by certain formal and external signs. *Africa v. Pennsylvania*, 662 F.2d 1025, 1032 (3d Cir. 1981). Applying this standard, Dr. Bushra's objections to the COVID vaccine are not "religious" and therefore not subject to accommodation.

Assessing whether a person's beliefs are religious is often a difficult, but necessary, step in a Title VII suit.  *Federoff v. Geisinger Clinic*, 571 F. Supp. 3d 376, 387 (M.D. Pa. 2021). Although courts should not inquire into the validity or plausibility of a belief, courts must differentiate between views that are religious in nature from those views that are "essentially political, sociological, or philosophical." *Fallon, supra*,  877 F.3d at 490  (*quoting United States v. Seeger*, 380 U.S. 163, 165 (1965)).

The Eastern District and other federal courts in Pennsylvania have consistently dismissed objections to vaccines and testing mandates which are cloaked in "religious" terms but in essence present secular, medical or scientific claims.  *See, e.g., Ulrich v. Lancaster Gen. Health, No. CV 22-4945,* 2023 WL 2939585, at *5 (E.D. Pa. Apr. 13, 2023)(dismissing Title VII action of nurse

opposing COVID testing which she contended "could bring potential harm, introduce harmful substances, cause adverse health effects or endanger [her] wellbeing," clearly state medical concerns which she attempts to "cloak with religious significance;") *Finkbeiner v. Geisinger Clinic*, supra, 623 F.Supp.3d at 465 (granting defendant's motion to dismiss Title VII failure-to-accommodate claim because plaintiff's objection to COVID-19 antigen testing was based on the contention that testing is harmful, explaining that her "opposition stems from her medical beliefs" and therefore is not entitled to Title VII protections); *Prewitt v. Walgreens Co*., 2012 WL 4364660 at *8, fn. 15 (E.D. Pa. Sept. 25, 2012)(employee's request to be exempt from administering flu vaccines, even though articulated as "religious," arose from a "personal preference and not a religious belief as intended by the statutes.")   A review of Dr. Bushra's exemption request demonstrates that his opposition to the vaccine was similarly based on medical or personal beliefs.

Dr. Bushra raised various objections to the COVID vaccine.  First, he objected to the COVID-19 vaccines because they were developed using fetal cell lines and he believes that abortion is murder.  (SMF ¶150). Plaintiff's purported opposition to testing on fetal cell lines is limited to the COVID-19 vaccine, as he takes and prescribes various medications which were also tested on fetal cell lines, including Tylenol, Motrin and Lidocaine.  (SMF ¶¶114-116). Indeed, Dr. Bushra's opposition to the COVID vaccines is not based on fetal cell lines because he objects to taking Novavax, a COVID vaccine that became available in 2022, which does not entail testing on fetal cell lines.  (SMF ¶¶111-113).  Any opposition to fetal cell lines by Dr. Bushra is therefore an "isolated moral teaching" rather than a "comprehensive system of beliefs about fundamental or ultimate matters." *See Fallon*, *supra*, 877 F.3d at 492.  Moreover, his isolated moral issues regarding fetal cell lines do not equate to a religious practice or observance precluding vaccination. *See Kiel v. Mayo Clinic Health Sys. Se. Minnesota*, 2023 WL 5000255 at *8 (D.Minn.Aug. 4,

2023)("A religious opposition to abortion is different from an opposition to vaccines that were potentially developed using a fetal cell line.")

Dr. Bushra was not employed by Main Line Health and thus was not fired due to his non-compliance with the COVID Policy.  Rather,  he was placed on administrative suspension from the Medical Staff pursuant to Section 4.E.1. of the Medical Staff Bylaws which provides:

> A Medical Staff Member who fails to comply with the Bylaws, Rules and Regulations, Medical Staff policies, or Main Line Health policies and procedures, may be placed on administrative suspension and the Member's Clinical Privileges suspended until the Member complies with the policy or obtains an approved exception as set forth in the policy. (SMF ¶155)

Therefore, if Dr. Bushra received Novavax (which his colleagues encouraged him to consider), his administrative suspension could have been lifted and his admitting privileges restored.  His ongoing objection to COVID vaccination, even Novavax which was not tested on fetal cell lines, confirms that his fetal cell line objection is not a genuine basis for his exemption request.

Dr. Bushra's second basis for his exemption request was that he had recovered from COVID-19, believed he was at a statistically low risk of reinfection and was not convinced that the benefits of vaccination outweighed the risks to him.  (SMF ¶119). Even before he submitted his exemption request, Dr. Bushra asked the President of the Medical Staff to create an exception to the COVID Vaccination Policy for those who had recovered from COVID. (SMF ¶88-94). He also told the President of Lankenau that it would be a "good business move" to offer temporary exemptions to individuals who had contracted COVID until the science becomes more clear whether they're at higher rate of infection.  (SMF ¶95). Even if Dr. Bushra sincerely believed that his natural immunity provided sufficient protection to him, the Third Circuit has explicitly held that concerns that a vaccine could do "more harm than good" is a medical, not a religious, belief. In *Fallon*, *supra*, 877 F.3d at 492, a health care worker opposed the hospital's flu vaccine mandate, contending "one should not harm their [sic] own body and … the flu vaccine may do more harm

than good." According to the Appeals Court, a "concern that the flu vaccine may do more harm than good—*is a medical belief, not a religious one*." *Id.* (emphasis added). The court affirmed the 12(b)(6) dismissal of Fallon's Complaint because his secular objections to the vaccine requirement were not protected under Title VII.   Similarly, in *Brown v. Children's Hosp. of Philadelphia*, 794 F. App'x 226, 227 (3d Cir. 2020), the Third Circuit affirmed the dismissal of a Title VII Complaint by a CHOP employee  who opposed the flu vaccine claiming it "may do more harm than good," which were deemed "medical, not religious beliefs."  *Id.  Accord Geerlings v. Tredyffrin/Easttown School District*, Civ. A. No. 21-4024, 2021 WL 4399672 at *7 (E.D. Pa. Sep. 27, 2021)(rejecting a Title VII challenge to a school COVID-prevention masking requirement based on the belief that masking "may do more harm than good," because a "concern that [a treatment] may do more harm than good[ ] is a medical belief, not a religious one.")

Dr. Bushra's third reason for his exemption request was that COVID vaccines were in short supply and were better directed towards those whose risk of serious illness or death was greater than his. (SMF ¶124). In addition to undermining his objection to COVID vaccines based on fetal cell lines, any concern about the scarcity of vaccines and how they should be allocated constituted a "political, sociological, or philosophical" concern, not religious. *Fallon*, 877 F.3d at 490.

Finally, and according to Dr. Bushra "most importantly," he contended that his Christian worldview required him to act in accordance with his conscience and to violate his conscience is a sin, which is explicit in Christian scriptures and is recognized by the First Amendment to the Constitution.  (SMF ¶125). Dr. Bushra's objection to the vaccine based on his "conscience" is the *only* objection referenced by his minister in the letter submitted with Plaintiff's exemption request. Plaintiff's reliance on the First Amendment reflects a legal argument, not a religious claim. Moreover, individuals who are not religious can have a "conscience." Simply declaring that one's

14

"conscience" is religious is fungible enough to avoid any workplace rule. The Supreme Court, Third Circuit and this Court have held that "the very concept of ordered liberty" precludes courts from granting anyone "a blanket privilege 'to make his own standards on matters of conduct in which society as a whole has important interests.'" *Africa v. Pennsylvania*, *supra*, 662 F.2d at 1031 (*quoting Wisconsin v. Yoder*, 406 U.S. 205, 215-16 (1972)).

In *Finkbeiner v. Geisinger Clinic,* 623 F. Supp. 3d 458 (M.D. Pa. 2022), *appeal dismissed*, No. 22-2714, 2023 WL 6057495 (3d Cir. Sept. 18, 2023), the court dismissed the Title VII religious discrimination claims of six plaintiffs who claimed that COVID-19 vaccines and tests are unsafe and ineffective. The lead Plaintiff, who was terminated for refusing to comply with a workplace requirement that unvaccinated employees undergo biweekly COVID testing, contended that "I am a Christian and hold a sincere religious belief that I have a God given right to make my own choices regarding what is good or bad for me…" *Id*. at 463.  According to the court, Plaintiff's belief that she has a "God given right to make her own choices –which, implicitly, her employer must unfailingly respect—would amount to a 'blanket privilege' and a 'limitless excuse for avoiding all unwanted obligations.'" *Id*. at 465.  Similarly, Dr. Bushra's opposition to COVID vaccination (including Novavax which was not developed with fetal cell lines) because it violates his "conscience" would amount to "a blanket privilege" and a "limitless excuse for avoiding all unwanted ... obligations."  In addition, the affront to his "conscience" is based on his belief that the benefits of vaccination are outweighed by the risks, which constitutes medical and personal beliefs, rather religious beliefs.  Therefore, he cannot maintain a religious accommodation claim.

### 2.    Granting Plaintiff a religious exemption would have imposed an undue burden on MLH's efforts to protect patients and employees

Even if Plaintiff could establish that he held a sincere religious objection to COVID vaccines, MLH would still be entitled to summary judgment.  Title VII does not provide every

employee requesting a religious accommodation with an absolute right to work unvaccinated. Rather, Title VII requires covered employers to accommodate their employees' sincerely held religious beliefs, ***unless doing so would impose "an undue hardship on the conduct of the employer's business."*** 42 U.S.C. §2000e(j)(emphasis added).  As discussed below, allowing Dr. Bushra to provide bedside care to patients would have imposed an undue hardship on Main Line Health's efforts to protect patients and staff and their families in the midst of a deadly pandemic.

As Title VII provides no guidance for determining the degree of accommodation required of an employer, the Supreme Court has attempted to definine the parameters of "undue hardship." In *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 78-79 (1977), an airline worker contended his religious beliefs prevented him from working on the Sabbath, but exempting him from Saturday shifts, violated the seniority system in the collective bargaining agreeement.  In addressing this conflict, the Court noted that Title VII only requires accommodation of religious observances, practices and beliefs that do not impose an "undue hardship" but fails to define when hardship becomes "undue." *Id*. at 72.  The Court held that requiring TWA to bear more than a *de minimis* cost to exempt plaintiff from working Saturdays would constitute an undue burden.  *Id*. at 84.

In *Groff v. DeJoy*, 600 U.S. 447 (2023), the Supreme Court revisited the "undue burden" standard and determined that "showing 'more than a de minimis cost,' as that phrase is used in common parlance, does not suffice to establish 'undue hardship' under Title VII." 600 U.S. at 468. Rather, the Court held that a religious accommodation presents an "undue hardship" when the "accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Id*. at 470.  The Court did not define "substantial increased costs;" rather, "[h]aving clarified the Title VII undue hardship standard," it deemed it "appropriate to leave the context-specific application of that clarified standard to the lower courts in the first instance." *Id.*

While the *Groff* decision was helpful in clarifying the "undue hardship" standard, it involved one postal worker whose religious objection to working Sundays "imposed on his coworkers, disrupted the workplace and workflow, and diminished employee morale." 600 U.S. at 456. *Groff* did not address the challenges to health care institutions in the midst of a deadly pandemic where the motivation for a mandatory vaccination policy was not inconvenience to co-workers, but rather, the health and safety of those co-workers, their families, and patients.

Although health and safety were not at issue in *Groff*, the Third Circuit has recognized that both "economic and non-economic costs can impose an undue hardship on employers." *E.E.O.C. v. Geo Group, Inc*., 616 F.3d 265, 273 (3d Cir. 2010) According to the court, "[a] religious accommodation that creates a genuine safety or security risk can undoubtedly constitute an undue hardship…." *Id.* at 273.   In deciding whether undue hardship exists, courts must "focus on the specific context of each case, looking to both the fact as well as the magnitude of the alleged undue hardship.'" *Id*. at 273.  *Accord Groff*, *supra*, 600 U.S. at 470-71 (determining "undue hardship" is a context specific inquiry). Therefore, assessing whether granting an exemption to the COVID policy to an unvaccinated doctor with direct patient care requires a specific analysis of the facts as they existed at the time Plaintiff's exemption request was denied.

COVID-19 had a tremendous impact on health care systems, patient access to care and quality of care.  (SMF ¶45). As COVID-19 spread across the country in waves, disproportionately impacting some communities and then moving on to others, health care systems struggled to keep up with patient demand. (SMF ¶46). The impact of COVID-19 on health care facilities was further strained by COVID-19 illness and death among health care workers and worker burn out. (SMF ¶48). In 2020, the prevalence of COVID infection among healthcare workers was 11%, noticeably higher than in the general population.  (SMF ¶50). Health care workers with direct patient care had

four times the risk of contracting COVID compared with health care workers without direct patient care. (SMF ¶51). More than 3,600 health care workers died of COVID-19 in the first year of the pandemic, including MLH staff. (SMF ¶52, 53).

MLH announced its COVID Vaccination Policy in August 2021, when the Delta variant was raging.  (SMF ¶81-82). During the Delta wave, full vaccination of frontline workers proved 80% effective in preventing COVID.  (SMF ¶61). Dr. Bushra acknowledges that vaccines reduced the severity of COVID and prevented deaths for some individuals. (SMF ¶63). He also admits that in the fall of 2021, the scientific community agreed that the COVID vaccine would reduce the chance for infection and lessen transmissibility. (SMF ¶87). Exemptions from mandatory vaccination policy have the potential to undermine a health care institution's ability to inhibit the spread of a serious communicable disease.  (SMF ¶72). Vaccination, masks, testing, and social distancing had the potential to reduce disease transmission but are all imperfect by themselves. (SMF ¶78). Dr. Bushra could not socially distance from patients.

Dr. Bushra believed that his personal risk of reinfection was lower than the risks of vaccination.  Although he survived COVID, but many did not.  The greater the number of religious exemptions, the higher the risk of COVID-19 infections and transmission.  Health care institutions had a responsibility to limit religious exemptions to those with sincerely held beliefs against vaccination in order to protect their staff and patients.    Main Line Health did just that; it did not approve all religious exemptions; rather, the Committees reviewed each one carefully to determine whether it articulated a sincerely held religious belief that precluded vaccination.  Dr. Bushra agrees that MLH should not have simply rubber-stamped exemption requests.  Dr. Bushra's exemption request, which raised various medical and personal objections to the vaccine, did not present a religious objection.  Allowing him to provide bedside care while unvaccinated created

an undue burden as it impaired the hospital from ensuring that their providers will "first, do no harm."[4]

Courts have dismissed religious failure-to-accommodate claims based on the undue hardship posed by the pandemic. In *Federoff v. Geisinger Clinic*, *supra*, 571 F. Supp. 3d 376, the Middle District denied injunctive relief to employees seeking to prevent Geisinger from implementing its COVID-19 vaccination policy. According to Chief Judge Brann, although the plaintiffs invoked religious discrimination, "the vast majority of their case appears to reflect a toxic combination of motivated reasoning and misinformation—a cocktail that that promises to plague this country long after COVID-19 has abated." *Id.* at 379.  The court determined that plaintiffs failed to meet their burden of establishing that their objections to vaccine and testing requirements were rooted in religion, rather than scientific or medical beliefs, and therefore it was not necessary to address Geisinger's contention that permitting their religious exemptions would impose an undue hardship.  *Id.* at 388.  Nevertheless, the court determined "for the sake of completeness" that Geisinger carried its burden of demonstrating undue hardship.  *Id.   See also Beickert v. New York City Dep't of Educ.,* No. 22-CV-5265(DLI)(VMS), 2023 WL 6214236 at *5 (E.D.N.Y. Sept. 25, 2023)(allowing special education teacher to work unvaccinated would present "a risk to the vulnerable and still primarily unvaccinated student population" and co-workers and therefore would have established an undue hardship warranting dismissal of plaintiff's claim); *Dennison v. Bon Secours Charity Health Sys. Med. Grp., P.C.*, 2023 WL 3467143, at *5 n.4, *6 n.7 (S.D.N.Y.

---

[4] In *Biden v. Missouri*, 142 S.Ct. 647, 652 (2022), the Supreme Court recognized the significant safety concerns that COVID-19 posed to a health system, noting that "COVID–19 is a highly contagious, dangerous, and … deadly disease" and that mandatory COVID vaccination measures were "necessary to promote and protect patient health and safety." According to the Court, "ensuring that providers take steps to avoid transmitting a dangerous virus to their patients is consistent with the fundamental principle of the medical profession: first, do no harm. It would be the very opposite of efficient and effective administration for a facility that is supposed to make people well to make them sick with COVID–19. *Id.* (citations and internal quotations omitted.)

May 15, 2023) (finding an "obvious hardship associated with the increased health and safety risk posed to other employees" by remaining at their worksite unvaccinated against COVID-19).

In *Aukamp-Corcoran v. Lancaster General Health*, supra, at *6, this Court determined on the summary judgment record that it would constitute an undue hardship to accommodate a religious exemption to the flu vaccination. The court recognized initially that "an employer is not required to grant a proposed accommodation that would 'either cause or increase safety risks or the risk of legal liability for the employer.'" *Id.* (citations omitted). Citing the Defendant's expert report, Judge Schmehl found that granting non-medical exemptions "significantly raises the danger that influenza will spread." *Id.* at *7.

The same analysis applies with respect to religious exemptions to COVID-19 vaccinations. Granting a religious exemption to Dr. Bushra, who provided bedside care to patients, would have undermined MLH's efforts to protect its patients and staff in the midst of a deadly pandemic. The undue hardship in a given case is not eliminated by the fact that MLH granted some religious based exemptions. As Dr. Salmon added: "a larger number of religious exemptions would result in a greater risk of COVID-19 disease transmission and outbreaks adversely impacting other health care staff, patients, and the capacity of the health care system to operate." Thus, each additional exemption would give rise to a significant impact to safety. *See Aukamp-Corcoran*, *supra, at* *8 ("Every single additional unvaccinated employee to whom patients are exposed adds to the risk to those patients.")

MLH adopted a vaccination Policy in order to protect patients, staff, families and the community. The Religious Exemption and Appeals Committees acted in good faith in only approving religious exemptions for those individuals who articulated sincerely held religious beliefs that precluded vaccination in order to protect their staff and patients. Granting religious

exemptions to all persons who requested them, including those without sincerely held religious practices or observances precluding vaccination, would have undermined the vaccine requirement leading to substantial disease, disability and/or death among health care staff and patients, particularly for health care workers like Plaintiff who had direct patient contact. Accordingly, Defendant has established an undue hardship with respect to any Title VII claim.

      **D.**     **Plaintiff cannot establish a claim for retaliation.**

     In addition to his failure-to-accommodate claim, Dr. Bushra alleges unlawful retaliation under both Title VII and the PHRA. Title VII prohibits an "employer" from retaliating against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). As detailed above, Dr. Bushra cannot maintain a Title VII retaliation claim against Main Line Health, Inc. which was never his employer. Nor can he establish a prima facie retaliation claim.

     To establish a prima facie case of retaliation under Title VII, a plaintiff must present evidence that (1) he engaged in a protected activity, (2) he suffered an adverse employment action, and (3) there was a causal connection between the protected activity and the adverse employment action. *Moore v. City of Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006). Plaintiff cannot establish any of these three elements.

     Dr. Bushra contends that he engaged in "protected activity" by requesting an exemption from the COVID vaccination policy. As this Court has recently stated, "[m]erely applying for a religious accommodation—rather than opposing the allegedly unlawful denial of a religious accommodation—does not constitute protected activity for the purpose of a Title VII retaliation claim." *Divine Equal. Righteous v. Overbrook Sch. for the Blind*, No. CV 23-846, 2023 WL 4763994, at *10 (E.D. Pa. July 26, 2023). *See also EEOC v. N. Mem'l Health Care*, 908 F.3d 1098,

1102 (8th Cir. 2018) (applicant whose job offer was rescinded after she requested religious accommodation failed to state Title VII retaliation claim because "merely requesting a religious accommodation is not the same as opposing the allegedly unlawful denial of a religious accommodation.")

Dr. Bushra is also foreclosed from establishing a prima facie claim for retaliation because he has not identified any "adverse employment actions."   Main Line Health, Inc. was never Plaintiff's employer and therefore could not engage in any adverse employment action.  Moreover, "a plaintiff claiming retaliation under Title VII must show that a reasonable employee would have found the alleged retaliatory actions 'materially adverse' in that they 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Moore v. City of Phila*., *supra*, 461 F.3d at 341 (*quoting Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68 (2006)).  The Supreme Court has explained that "material adversity" is distinct from "trivial harms" because "Title VII ... does not set forth 'a general civility code for the American workplace.'" *Burlington*, supra, 548 U.S. at 68 (citations omitted). Protection from retaliation "cannot immunize [an] employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Burlington*, 548 U.S. at 68.

Plaintiff's Complaint identifies a series of incidents which Dr. Bushra believes were retaliatory, each of which falls squarely into the category of "petty slights or minor annoyances:":

(1) On September 21, 2021, Dr. Bushra told Phil Robinson, the  President of Lankenau Medical Center, that he had requested a religious exemption.  Dr. Bushra contends that Mr. Robinson, who was not involved with religious exemption requests,  made a face showing "disbelief and disdain" in retaliation for his religious objection.  (Complaint ¶¶43-44).

(2) Dr. Bushra contends MLH leadership and MLEMA's president discussed who would replace Plaintiff as campus chief if his exemption request were denied. (Complaint ¶¶45-47).

(3) Dr. Bushra alleges that he was placed on administrative suspension because he attended a meeting on November 9, 2021 that he was required to attend. (Complaint ¶¶ 59-63). As discussed below, Dr. Bushra admits that he knew on October 19, 2021 that he would be suspended if he did not get vaccinated.

(4) After he was placed on administrative suspension from the Medical Staff, Chief Medical Officer Jonathan Stallkamp denied Dr. Bushra's offer to help during Code Orange emergencies, when patient volumes increased and staffing was strained. (Complaint ¶¶72-74).

(5) Dr. Bushra contends that in January 2022, the Medical Staff attempted to restrict his reappointment to a one-year term rather than two years. He acknowledges that although he was initially told the reappointment was for one year, he received notification on March 15, 2022 that was an clerical error which was corrected to reflect that he had been reappointed for a two-year term. (Complaint ¶¶86-90).

(6) In April 2022, CMO Jonathan Stallkamp would not allow Dr. Bushra to supervise MLH staff during planning for an NCAA basketball game which never occurred because Villanova did not make it that far in the playoffs. (Complaint ¶¶ 91-99).

Even accepting Dr. Bushra's version of these incidents, they do not constitute materially adverse actions for purposes of a retaliation claim.

### 3.     Dr. Bushra has failed to establish a causal connection

Dr. Bushra cannot establish that any of the alleged retaliatory acts resulted from his request for a religious exemption. In particular:

(1) Even accepting Plaintiff's contention that Mr. Robinson made a face when Dr. Bushra said he had applied for a religious exemption, he never showed his exemption request to Mr. Robinson, who was not involved in reviewing religious exemption requests.  (SMF ¶132)

(2) MLH's efforts to determine who would replace Dr. Bushra as campus chief at Lankenau in the event his exemption request were denied was part of a consistent effort by Chief Medical Officer Jon Stallkamp to ensure that all Department Heads and Campus Chiefs had backup plans. Dr. Stallkamp became CMO when his predecessor died and he took succession planning to heart. (SMF ¶137)

(3) Dr. Bushra's contention that he was placed on administrative suspension in retaliation for attending a meeting on November 9, 2021 ignores undisputed facts that Dr. Bushra knew on October 19, 2021 that he would be administratively suspended if he remained unvaccinated; Plaintiff's attorney told MLH counsel on November 1, 2021 that MLH planned to suspend Dr. Bushra the next day and Dr. Bushra needed "some quick intervention to hold on the suspension until we can create a path for a leave of absence" in order "to avoid a suspension;" Dr. Bushra requested a leave of absence from the Medical Staff on November 3, 2021 effective immediately; and (d) while his request for a leave of absence was pending, Dr. Bushra attended the November 9, 2021 meeting; and (e) Dr. Bushra and the other medical staff members who were non-compliant with the COVID-19 vaccine mandate were suspended on November 15, 2021.  (SMF ¶¶156-162).

(4) Dr. Bushra was not permitted to work during the Code Orange because he was administratively suspended due to non-compliance with the COVID policy.  It defies logic that Dr. Bushra expected to return to in the middle of a COVID surge after he had been administratively suspended for failing to comply with the COVID policy.

(5) Dr. Bushra has offered no support for his claim that the initial notification that his medical staff membership was renewed for only one year- which MLH said was a clerical error that was promptly rectified – was retaliatory.  He never asked what was the basis of the error, but rather, simply attributed it to malevolence.

(6) Dr. Stallkamp's decision that Plaintiff could not supervise MLH staff at the Villanova basketball game was because he was not an active member of the medical staff and therefore he could not supervise MLH staff at that event (which never occurred). (SMF ¶¶171-175).

## IV.    <u>CONCLUSION</u>

This matter is ripe for summary judgment.   For all of the foregoing reasons, Defendant respectfully asks that the Court enter summary judgment in their favor and dismiss Plaintiff's Complaint in its entirety.

Respectfully submitted,

Brendan Hennessy
(Pa. Attorney I.D. No. 91831)
101 Lindenwood Drive, Suite 225
Malvern, PA 19355
bhennessy@hennessylawfirm.com
(484) 875-3111 (office)
*Of Counsel to Litvin Law Office*
*for Defendant*

/s/ Caren Litvin
Caren Litvin, Esq.
(Pa. Atty I.D. No. 41796)
150 N. Radnor Chester Road, Suite F-200
Radnor, PA  19087
CL@litvinlawoffice.com
(610) 977-2049 (office)
*Counsel for Defendant*

Dated:  October 16, 2023